UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HDI-GERLING AMERICA INSURANCE COMPANY, individually and as assignee and/or subrogee of Feeney Brothers Excavation LLC, Mohawk Power Corporation d/b/a National Grid, and Kelly L. Melvin-Feeney (individually and as personal representative of the estate of Gary Thomas Feeney), <br><br>  Plaintiff/Counterclaim Defendant, <br><br>  v. <br><br> NAVIGATORS INSURANCE COMPANY, <br><br>  Defendant/Counterclaim Plaintiff. | Civil Action No. 15-10338-FDS |

**MEMORANDUM AND ORDER ON
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

**SAYLOR, J.**

      This action arises out of an insurance coverage dispute between a primary insurer and an excess insurer following the settlement of a wrongful death claim. Plaintiff HDI-Gerling America Insurance Company has filed suit against defendant Navigators Insurance Company seeking declaratory relief and alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A. Navigators has filed counterclaims against HDI-Gerling, alleging bad faith and violation of Mass. Gen. Laws ch. 93A. Jurisdiction is based on diversity of citizenship.

      The parties agreed that the potential application of the anti-subrogation rule under New York law is a threshold issue, and each party has submitted a motion for partial summary judgment on that issue. For the following reasons, the parties' cross-motions will be denied.

I.      **Background**

    A.      **Factual Background**

Feeney Brothers Excavation, LLC is a construction company. In 2013, HDI-Gerling America Insurance Company issued two insurance policies to Feeney Brothers. (Def. SMF ¶¶ 6, 14). The first policy was a general liability policy with a limit of insurance of $1 million per occurrence (the "General Liability Policy"). (*Id.* ¶¶ 6-7). National Grid (more precisely, Mohawk Power Corporation, doing business as National Grid) was an additional insured under the General Liability Policy. (Pl. SMF ¶ 8).

The second policy issued to Feeney Brothers was a workers' compensation and employer's liability policy (the "Employer Liability Policy"). (Def. SMF ¶ 14). The policy provided two types of coverage: workers' compensation coverage (Part A) and employer's liability coverage (Part B). (*Id.* ¶ 15). Although the policy generally provided limits of liability of $1 million per accident, under a New York Limit of Liability Endorsement, HDI-Gerling's liability under the Employer Liability Policy was unlimited if the underlying claim involved bodily injury that would be compensable under New York workers' compensation law. (*Id.* ¶ 22; Pl. SMF ¶ 6).[1] National Grid was not an additional insured under the Employer Liability Policy. (Def. SMF ¶ 20).

Navigators Insurance Company also issued an insurance policy to Feeney Brothers. That

---

[1] The New York Limit of Liability Endorsement appended to the Employer Liability Policy states as follows:

    This endorsement applies only to the insurance provided by [the HDI-Gerling Employer's Liability coverage] because New York is shown in Item 3.A. of the Information Page.

    We may not limit our liability to pay damages for which we become legally liable to pay because of bodily injury to your employees if the bodily injury arises out of and in the course of employment that is subject to and is compensable under the Workers' Compensation Law of New York.

(Def. SMF ¶ 23).

policy was a commercial excess insurance policy with limits of insurance of $10 million per occurrence and $10 million general aggregate (the "Navigators Excess Policy"). (*Id.* ¶¶ 24-25). National Grid was an additional insured under the excess policy. (*Id.* ¶ 27). The Navigators Excess Policy identified both the General Liability Policy and the Employer Liability Policy as underlying insurance policies. (*Id.* ¶ 28).[2]

Gary Thomas Feeney was an employee of Feeney Brothers Excavation LLC. On April 13, 2013, Feeney was killed in a workplace accident in New York. (Pl. SMF ¶ 2). Although there is little evidence concerning that accident in the record, it appears that he was helping to unload a 40-foot pipe from a tractor-trailer when the pipe fell on him. (Def. SMF Ex. 6). At the time of the accident, Feeney was employed by Feeney Brothers on a job it was performing under a contract with National Grid. (Pl. SMF ¶ 2).

On November 8, 2013, Kelly Melvin-Feeney, individually and as representative of Gary Feeney's estate, filed suit against National Grid in the Supreme Court of New York (the "Feeney Action"). (Def. SMF ¶ 1). The suit alleged that National Grid negligently caused the accident and Gary Feeney's death. (*Id.* ¶ 2). National Grid sought coverage as an additional insured under the General Liability Policy and the Navigators Excess Policy. (*Id.* ¶ 5). HDI-Gerling agreed to defend and indemnify National Grid under the General Liability Policy. (Pl. SMF ¶ 17).

HDI-Gerling eventually negotiated a global settlement of the Feeney Action that included a settlement of the wrongful-death action for a total $1,500,000 and a workers' compensation claim payment of $250,000. (Pl. SMF ¶ 20; Def. SMF ¶ 40). The settlement was structured so that $1,500,000 would be paid under the General Liability Policy, and $250,000 would be paid

---

[2] It appears that the workers' compensation coverage portion of the HDI-Gerling Employer Liability Policy was not included as an underlying policy.

under the workers' compensation coverage portion of the Employer Liability Policy. (Pl. SMF ¶¶ 20-21).[3] Because the General Liability Policy had a coverage limit of $1,000,000, HDI-Gerling now seeks to recover the $500,000 "shortfall" from Navigators under the terms of the Navigators Excess Policy, which Navigators has refused to pay.

### B. Procedural Background

On February 11, 2015, HDI-Gerling filed a complaint against Navigators. It filed the complaint both individually and as assignee and/or subrogee of Feeney Brothers Excavation LLC, Mohawk Power Corporation doing business as National Grid, and Kelly L. Melvin-Feeney (individually and as personal representative of the estate of Gary Thomas Feeney). The complaint contains claims for (1) declaratory relief, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) violation of Mass. Gen. Laws ch. 93A. In substance, HDI-Gerling seeks recovery of $500,000 that it alleges Navigators owes as the issuer of the excess policy.

Navigators filed an answer that asserted five counterclaims: (1) bad faith; (2) equitable subrogation; (3) breach of the implied covenant of good faith and fair dealing; (4) violation of Mass. Gen. Laws ch. 93A; and (5) declaratory relief. The counterclaims for equitable subrogation and breach of the implied covenant of good faith and fair dealing have been dismissed, leaving only the counterclaims for bad faith, violation of Mass. Gen. Laws ch. 93A, and declaratory judgment.

## II. Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

---

[3] Navigators contends that HDI-Gerling acted inequitably in intentionally allocating only $250,000 of the settlement to the workers' compensation policy and the remaining $1,500,000 to the general liability policy so as to trigger the excess insurance policy. HDI-Gerling does not appear to dispute the allocation of the settlement, but does dispute that its conduct was unfair, in bad faith, or was otherwise inequitable.

to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

**III.    Analysis**

    **A.    The Anti-Subrogation Rule**

Subrogation "entitles an insurer to 'stand in the shoes' of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *North Star Reinsurance Corp. v. Continental Ins. Co.*, 82 N.Y.2d 281, 294 (1993) (citing *Pennsylvania Gen. Ins. Co. v. Austin Powder Co.*, 68 N.Y.2d 465, 471 (1986)). "The insurer's right of subrogation [has been] long recognized as a matter of equity." *Pennsylvania Gen.*, 68 N.Y.2d at 471 (listing cases).

Under the "anti-subrogation rule," however, an insurer "has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered." *North Star*, 82 N.Y.2d at 294 (citing *Pennsylvania Gen.*, 68 N.Y.2d at 468). "In other words, an insurer may not step into the shoes of its insured to sue a third-party tortfeasor—if that third party also qualifies as an insured under the same policy—for damages arising from the same risk covered by the policy." *ELRAC, Inc. v. Ward*, 96 N.Y.2d 58, 76 (2001).

There are at least two purposes of the anti-subrogation rule. First, the rule "prevent[s] an insurer from using the right of subrogation to avoid paying coverage that is due under the policy." *Id.* In addition, the rule "limits the instances in which an insurer and its insured have adverse interests, which might undercut an insurer's incentive to provide a vigorous defense to its insured." *Id.*

The most basic application of the anti-subrogation rule involves a single insurance policy with a single insured. *See, e.g., Chrysler Leasing Corp. v. Public Adm'r, N.Y. County*, 448 N.Y.S.2d 181 (N.Y. App. Div. 1982). A slight variation exists when a dispute involves one insurance policy covering two different insured parties, one of whom has sustained a loss due to the alleged negligence of the other. *See, e.g., Pennsylvania Gen.*, 68 N.Y.2d 465.

The application of the rule becomes more complex when the facts presented involve more than one policy and more than one insured. In *Hartford Accident & Indemnity Co. v. Michigan Mutual Insurance Co.*, 61 N.Y.2d 569, 573-74 (1984), the Court of Appeals had declined to find the anti-subrogation rule applicable in a case involving multiple policies and insureds. There, Michigan Mutual insured three entities—DeFoe, L.A.D., and D.A.L.—under a general liability policy and the same three entities under a workers' compensation policy. *Id.* at 572. Hartford insured all three companies under an excess liability policy. *Id.* An employee of

D.A.L. named Gobin filed a negligence action against DeFoe and L.A.D. *Id.* In defending DeFoe and L.A.D., Michigan Mutual chose not to assert a claim against Gobin's employer, D.A.L. *Id.* at 573.

The primary issue in *Hartford* was whether Michigan Mutual acted in bad faith by refusing to implead D.A.L. The court rejected Michigan Mutual's defense to that claim to the extent that it was based on the anti-subrogation rule:

> Michigan's reliance on the rule that an insurer may not maintain a subrogation action against its own insured is . . . misplaced[,] for that rule speaks to an insured under the same policy. Here Michigan Mutual provided two policies, one a general liability policy and the second a compensation policy which covered not only D.A.L.'s obligations under the Workers' Compensation Law, but also under paragraph I(B) of the standard policy required Michigan to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident * * * by any employee of the insured arising out of and in the course of his employment by the insured" Michigan Mutual would, therefore, under its compensation policy, be obligated to defend D.A.L. had it been impleaded in the Gobin action and to indemnify D.A.L. against payment of damages on the impleaded cause of action should it be held liable. That obligation would arise, however, not under the liability policy under which it was defending DeFoe and L.A.D., but under the separate compensation coverage of D.A.L.

*Hartford*, 61 N.Y.2d at 573-74 (citation omitted).

However, in the later case of *North Star*, the New York Court of Appeals found that the anti-subrogation rule applied in a case involving two policies, each naming a different insured. 82 N.Y.2d at 296. Although the policies were nominally separate policies, the court found that the rule applied because the two policies were purchased by the same entity, issued simultaneously by the same insurer, and covered the same risk. *Id.* Application of the anti-subrogation rule was proper because "the two policies [were] integrally related and indistinguishable from a single policy in any relevant way." *Id.*

    B.    **<u>Application of the Rule</u>**

Here, HDI-Gerling paid the entire global settlement of $1.75 million. It contends that the

7

$500,000 difference between the $1 million limit of the General Liability Policy and the $1.5 million of the settlement should be paid from the Navigators Excess Policy. (Compl. ¶¶ 53-60). Navigators, however, contends that HDI-Gerling should have asserted claims for contractual indemnity, common-law indemnity, and contribution against Feeney Brothers, which would have triggered the coverage of the Employer Liability Policy. (Countercl. ¶ 12). In response, HDI-Gerling asserts that under the anti-subrogation rule, it was precluded from asserting third-party claims on behalf of National Grid against Feeney Brothers.

The parties have agreed that the potential application of the anti-subrogation rule is a threshold question to resolving the dispute. Accordingly, the limited question before the Court on the parties' cross-motions is whether, under New York law, the anti-subrogation rule precluded HDI-Gerling from filing a third-party action against Feeney Brothers on behalf of National Grid for contribution and indemnity.[4]

HDI-Gerling's position is straightforward. It contends that because National Grid and Feeney Brothers were both co-insureds under the General Liability Policy, it could not assert a third-party claim against Feeney Brothers on National Grid's behalf, notwithstanding the fact that such a claim would have also implicated the Employer's Liability Policy that HDI-Gerling had issued to Feeney Brothers.

Navigators contends that the present case is similar to *Hartford*, which found that the anti-subrogation rule did not preclude a third-party claim. The Court agrees that the facts presented here are somewhat similar to those described in *Hartford*. Both here and in that case, an insurer covered an owner and an employer under a general liability policy. In both cases, the same insurer covered the employer under a combination workers' compensation and employer's

---

[4] The parties agree that New York law applies for the purposes of this motion. *See* D. 49.

liability policy.  The *Hartford* court found that notwithstanding the fact that both parties were insured under a general liability policy, the anti-subrogation rule did not preclude the insurer from asserting (on behalf of the owner) a third-party action against the employer that would have implicated the separate liability policy.  Its rationale was that the insurer's obligation to defend the employer arose "not under the liability policy under which it was defending [the owner], but under the separate compensation coverage of [the employer]."  *Hartford*, 61 N.Y.2d at 574 (citation omitted).

      Read broadly, *Hartford* would seem to indicate that the anti-subrogation rule does not bar an insurer from impleading a co-insured where the insurer's obligation to the co-insured arises under a different policy—even where both insured parties are also covered under the separate, original policy that gave rise to the insurer's obligation to defend the first-party action.  In *Pennsylvania General* and *North Star*, however, the New York Court of Appeals may have questioned or potentially limited *Hartford* in two respects.  First, in *Pennsylvania General*, the court appears to have cast doubt on the applicability of *Hartford* to the doctrine of anti-subrogation by noting that *Hartford* "alluded to" but did not "formally address[]" the principle that an insurer may be subrogated to a claim against its own insured arising from the policy that covers the insured.  *Pennsylvania Gen.*, 68 N.Y.2d at 471.  Although it is true that the *Hartford* court did not use the word "anti-subrogation," that statement is curious because the *Hartford* court did, in fact, explicitly refer to "the rule that an insurer may not maintain a subrogation action against its own insured."  *Hartford*, 61 N.Y.2d at 573.  And in *North Star*, the court described the holding of *Hartford* as a case in which the impleaded insured "would have been covered *only* under a separate . . . policy also issued by [the same insurer]."  82 N.Y.2d at 295 n.4.  In *Hartford*, however, it appears that the employer was in fact covered under *both* the

general liability policy *and* the compensation/employer's liability policy that would have been implicated by a third-party action. *Hartford*, 61 N.Y.2d at 572.[5]

Regardless, both *North Star* and *Hartford* suggest that, at a minimum, the anti-subrogation rule does not bar a third-party claim by an insurer on behalf of one co-insured against another when the impleaded co-insured is not actually covered by the common policy. The question here then becomes whether the General Liability Policy actually covered the Feeney claim, such that Feeney Brothers and National Grid were co-insureds.

### C.  Whether an Exclusion Applies

Navigators contends that the co-insureds (Feeney Brothers and National Grid) were not covered by the common policy (the General Liability Policy) as to the claims brought in the Feeney Action. According to Navigators, the General Liability Policy contained several exclusions for coverage that arguably were implicated by the underlying Feeney Action. As one example, Navigators points to an exclusion in the General Liability Policy for bodily injury arising out of the use of an automobile, including "loading or unloading." (Def. SMF Ex. 3, General Liability Policy Section I.2.g).  Navigators contends that the exclusion may have applied to exclude coverage under the policy. If so, under *North Star* and *Hartford*, the anti-subrogation rule would not have precluded HDI-Gerling from impleading Feeney Brothers in the course of its defense of National Grid, because Feeney Brothers would have been covered *only* under the Employer's Liability Policy.

There is almost no evidence currently before the Court as to whether that exclusion (or any other exclusion) was, in fact, implicated by the facts of the underlying accident. There is, however, at a minimum, evidence that HDI-Gerling at least initially believed the exclusion might

---

[5] The employer would not have been covered under an excess policy. *See Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co.*, 462 N.Y.S.2d 175, 177 (1983), *aff'd*, 61 N.Y.2d 569 (1984).

apply before it later conceded that coverage applied. (*See* Def. SMF Ex. 6, May 2, 2013 Letter from HDI-Gerling to Feeney Brothers) (noting HDI-Gerling's position that an investigation "suggests that the accident arose during the 'loading and unloading'" of the pipe from a forty-foot trailer "such that it qualifies as 'arising out of the use . . . of any "auto."'").

On cross-motions for summary judgment, a court must determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). Because of the state of the evidence, the Court cannot conclude whether the exclusion applied to bar coverage under the General Liability Policy. Accordingly, the Court cannot, as a matter of law, resolve the question whether Feeney Brothers and National Grid were co-insureds under the General Liability Policy, and therefore whether the anti-subrogation rule would have barred HDI-Gerling from bringing a third-party action against Feeney Brothers. If no exclusions apply, the court will have to answer a more difficult question, but that is not an issue that need be resolved here.[6]

### D. Equitable Considerations

Furthermore, and in any event, the applicability of a coverage exclusion is not the only unresolved issue that may be relevant.

The right of subrogation is "a matter of equity." *Pennsylvania Gen.*, 68 N.Y.2d at 471; *North Star*, 82 N.Y.2d at 295. Accordingly, as an exception to normal subrogation principles, the anti-subrogation rule is also equitable in nature. Navigators contends that because the anti-subrogation rule is an equitable doctrine, it should not apply based on HDI-Gerling's allegedly inequitable conduct.

---

[6] In its briefing, HDI-Gerling asks the Court to assume that no coverage exclusions apply, and then to decide whether, in that case, the anti-subrogation rule would have barred it from impleading Feeney Brothers as part of its defense of National Grid. The Court declines to issue what would amount to a ruling that is, in effect, contingent on the future resolution of a disputed issue of material fact.

11

It is "well-established that a litigant who seeks equity must do equity." *In re U.S. Lines, Inc.*, 318 F.3d 432, 436 (2d Cir. 2003); *Grosch v. Kessler*, 256 N.Y. 477, 478 (1931) ("The plaintiff seeks the aid of equity, and must submit to the condition that he do equity himself."). That requirement "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (a party seeking equitable remedies must "come with clean hands").

Navigators has submitted a number of e-mails detailing at least some of the discussions and strategy that it contends played a part in HDI-Gerling's orchestration of the Feeney Action settlement. Without recounting the details of each communication, it is sufficient to note that when taken in the light most favorable to Navigators, those e-mails tend to show that HDI-Gerling deliberately allocated the settlement in such a manner as to force Navigators to cover the excess amount at issue here.[7]

If so, application of the anti-subrogation rule would, in effect, reward HDI-Gerling for acting inequitably, not prevent it from doing so as the rule is intended. Nor would application of the anti-subrogation rule to such facts further the policy justifications of the rule. In substance, instead of *preventing* HDI-Gerling from avoiding coverage under a policy or passing liability on to its insured, the anti-subrogation rule here would in fact *facilitate* HDI-Gerling's avoidance of coverage under the Employer Liability Policy. The rule is also meant to "guard against the potential for conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured." *North Star*, 82 N.Y.2d at 295 (citing *Pennsylvania Gen.*, 68 N.Y.2d at 471-72). Taking the facts in the light most favorable to Navigators, it could be argued that

---

[7] Among other things, Navigators challenges HDI-Gerling's decision to allocate only $250,000 of the global settlement of the Feeney Action to the underlying workers' compensation claim.

instead of defending Feeney Brothers, HDI-Gerling conceded coverage under the General Liability Policy so that it could cap its liability at $1,000,000 and avoid its responsibility for unlimited coverage under the Employer Liability Policy.

Thus, even assuming that no exclusions applied under the General Liability Policy, material disputed issues of fact remain with respect to HDI-Gerling's conduct in arranging and allocating the settlement in the Feeney Action.[8]  Accordingly, the Court cannot ascertain whether HDI-Gerling is entitled to an equitable remedy.

## V.     Conclusion

At a minimum, disputed issues of material fact remain with respect to the applicability of any coverage exclusions contained in the General Liability Policy, as well as with respect to HDI-Gerling's conduct in negotiating and finalizing the settlement of the underlying Feeney Action.  For the foregoing reasons, the parties' cross-motions for summary judgment are DENIED.

**So Ordered.**

Dated: August 4, 2016

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

---

[8] To be clear, although the two issues may overlap to some extent, the Court notes that a finding that HDI-Gerling acted inequitably would not necessarily also lead to a finding in Navigators' favor on its bad-faith claim under New York law.